IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>by Nicholas deB. Katzenbach,<br>Attorney General of the United States,<br><br>    Plaintiff,<br><br>v.<br><br>DYERSBURG BOARD OF EDUCATION;<br>HUGH M. TODD, JR., Chairman, and<br>WILLIAM MURRAY, GEORGE YARBRO,<br>A.D. WALKER, JR., FRED CHILDRESS,<br>and WILLIAM S. YATES, members of the<br>Dyersburg Board of Education and<br>W.C. WARREN, Superintendent of the<br>Dyersburg City Schools,<br><br>    Defendants. | No. 2:66-cv-00241-SHL |

### ORDER GRANTING JOINT MOTION FOR
### DECLARATION OF UNITARY STATUS AND DISMISSAL

    Before the Court is the Joint Motion for Declaration of Unitary Status and Dismissal, filed February 5, 2026. (ECF No. 30.) In 1967, this Court approved a desegregation plan for the city schools of Dyersburg, Tennessee, and retained jurisdiction to oversee the plan. (ECF No. 30-1 at PageID 106–07.) The Parties seek a declaration that the Dyersburg City Schools District have been sufficiently desegregated to achieve "full unitary status," and they seek dismissal of the case. (ECF No. 30 at PageID 103.)

    For the reasons stated below, the Motion is **GRANTED**.

### BACKGROUND

    On August 25, 1966, the United States Department of Justice ("DOJ") filed a complaint against the Dyersburg City Board of Education challenging the de jure racial segregation of the

District. (ECF No. 30-1 at PageID 106.) The following year, this Court approved the Board's desegregation plan. (Id. at PageID 107.) That plan focused "almost exclusively" on assigning students to various schools in the District, with some attention to staff assignments. (Id. at PageID 110; see also ECF No. 16 at PageID 74 ("Pursuant to direction of the United States District Court for the Western District of Tennessee . . . the [Board] has adopted a policy of complete freedom of choice to be offered annually in all grades of all schools . . . .").) The Court has retained jurisdiction since 1966. (ECF No. 30-1 at 107.)

Although it is not clear from the limited historical record to what extent the Court actively supervised the District's desegregation, the DOJ has continued to monitor its progress. (Id.) As recently as February 10, 2023, the DOJ "required the District to provide data about student assignment, faculty and staff, extracurricular activities and transportation, as well as general information including a description of race-based complaints and a list of staff responsible for implementing the District's desegregation efforts." (Id.)

One change since 1966 is that the Parties "no longer dispute the existence of *de jure* segregation" in Dyersburg public schools at the time of the complaint. (Id. at PageID 110.) But they all argue that the District's desegregation efforts have been successful. (Id. at PageID 110–20.) Pointing to data from the 2022–2023 and 2024–2025 school years, they assert that the District has achieved desegregated, unitary status. (Id.)

For example, since 1993, all District students in the same grade have shared one school, whether at the primary, intermediate, middle, or high school level. (Id. at PageID 110–111.) In the 2024–2025 school year, Black students made up 39.88% of the District; White students, 41.58%; and all others, 18.59%. (Id. at PageID 111.) Faculty and staff are assigned to schools "without regard to race," so that "no school is racially identifiable based on actions of the

District." (Id. at PageID 112.) Of the 187 teachers employed in 2024–2025, twelve were Black; out of ten principals and assistant principals, two were Black. (Id. at PageID 113.) As to school transportation, bus service is offered to all students, with routes designed by neutral software. (Id. at PageID 114.) Although only 25% of bus riders are White, the Parties state that bus utilization is a family decision, not a District assignment. (Id. at PageID 115.) Extracurricular activities are likewise integrated. (Id.)

The DOJ has also monitored "certain quality-of-education factors, including disciplinary consequences, gifted and talented programs, and services for students with disabilities." (Id. at PageID 116.) The Parties concede that the 2022–2023 data "demonstrate some lingering disparity by race," but contend that "those disparities have improved" and that the District "is committed to continuing efforts" toward improvement. (Id.) For example, "a small achievement gap" exists between White students and their Black, Hispanic, and Native American peers. (Id.) Further, the Tennessee Department of Education cited the District in October 2022 for having "a significant, disproportionate number of black students served under [the Individuals with Disabilities Education Act ('IDEA')] with discipline incidents." (Id. at PageID 117.) Since then, however, the Parties assert that the District has not been cited "as significantly disproportionate" in any category. (Id.) Disparities are also present with respect to school discipline and gifted programs, although the Parties state that "eligibility for these programs is determined according to state directives" or other objective criteria, not race. (Id. at PageID 117–19.)

## APPLICABLE LAW

"The transition to a unitary, nonracial system of public education was and is the ultimate end to be brought about." Green v. County Sch. Bd. of New Kent County, 391 U.S. 430, 436 (1968) (citing Brown v. Bd. of Educ. of Topeka, 349 U.S. 294, 299–301 (1955)). Unitary status

3

means that a school district has abandoned the "dual" status of "intentional segregation of students by race" and "has been brought into compliance with the command of the Constitution." Freeman v. Pitts, 503 U.S. 467, 487 (1992) (citation modified). Although "the term 'unitary' is not a precise concept," Freeman, 503 U.S. at 487, the Supreme Court identified certain "facet[s] of school operations" to examine before declaring a school system free of racial discrimination: student assignment, faculty assignment, staff assignment, facilities and resources, transportation, and extracurricular activities. Green, 391 U.S. at 435.

The Court later added that "[t]he ultimate inquiry is whether the [constitutional violator] ha[s] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable." Missouri v. Jenkins, 515 U.S. 70, 89 (1995) (citation modified). The Court has described a number of factors to consider, including: (1) whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; (2) whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and (3) whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance. Freeman, 503 U.S. at 491.

To establish the presence of de jure segregation in a school district, "'a plaintiff must show '(1) action or inaction by public officials (2) with a segregative purpose (3) which actually results in increased or continued segregation in the public schools.'" Spurlock v. Fox, 716 F.3d 383, 396 (6th Cir. 2013). Where, however, "racial 'unevenness'" exists, a court "must decide if the current conditions are vestiges of the prior unconstitutional de jure system or the products of

4

other actions or conditions." Robinson v. Shelby Cnty. Bd. of Educ., 566 F.3d 642, 653 (6th Cir. 2009) (citing Reed v. Rhodes, 179 F.3d 453, 466 (6th Cir. 1999)). Those "vestiges of segregation . . . must be so real that they have a causal link to the de jure violation being remedied." Freeman, 503 U.S. at 496.

Finally, "public policy strongly favors settlement of disputes without litigation. . . . Settlement agreements should therefore be upheld whenever equitable and policy considerations so permit." Robinson, 566 F.3d at 648 (citation omitted). "Thus, while the district court should not give 'rubber stamp approval' in lieu of independent review to the parties' joint unitary status motion, it must afford considerable weight to the joint motion when it is reasonable, filed in good faith, and demonstrates that the constitutional mandate requiring desegregation has been satisfied." Id. (internal citation omitted).

## ANALYSIS

The Parties contend that the District "worked diligently in the initial years of the Court's desegregation order to implement the approved desegregation plan and to remove, to the extent practicable, all vestiges of *de jure* segregation." (ECF No. 30-1 at PageID 120.) Since then, according to the Parties, the District has continued to operate "in a non-discriminatory fashion and without regard to race." (Id.) Thus, the Parties contend that, because the District has complied in good faith with its desegregation obligations, "it no longer operates a dual system of public education." (Id. at PageID 121.)

The Court emphasizes that it has not conducted its own investigation into these facts, but it affords "considerable weight" to the joint motion, as it appears "reasonable, filed in good faith, and demonstrates that the constitutional mandate requiring desegregation has been satisfied." See Robinson, 566 F.3d at 648. The Court need not find that all the goals of equality have been

5

achieved in the District in order to declare that the District has reached unitary status. Rather, the question is whether the District has "complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable." Jenkins, 515 U.S. at 89.

The Court finds that it has. The Board has shifted the District from one of separate schools and separate programs, to one in which all students of the same grade attend the same schools and may join the same programs. Although the Parties concede the presence of racial disparities in the District, it does not appear that these disparities are "vestiges of the prior unconstitutional *de jure* system," Robinson, 566 F.3d at 653, but have their own independent causes. In fact, the most persuasive argument for the remediation of de jure segregation is that all students of the same grade have attended the same school since 1993. (See ECF No. 30-1 at PageID 110–111.) Thus, because the Board has acted in good faith, the Court need not retain judicial control over its efforts.

## CONCLUSION

For the reasons stated above, the Motion is **GRANTED**. The Dyersburg City Schools District is **DECLARED** unitary and the case is **DISMISSED**.

**IT IS SO ORDERED,** this 11th day of February, 2026.

                                         s/ Sheryl H. Lipman  
                                         SHERYL H. LIPMAN  
                                         CHIEF UNITED STATES DISTRICT JUDGE